**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BROTHERS HOLDING, LLC,<br><br>             Plaintiff,<br><br>vs.<br><br>TOWNSHIP OF WEEHAWKEN and<br>TOWNSHIP OF WEEHAWKEN RENT<br>LEVELING BOARD,<br><br>             Defendants. | Civil Action No. 2:23-cv-03185 |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**KRANJAC TRIPODI & PARTNERS LLP**
Xavier M. Bailliard, Esq.
James Van Splinter, Esq.
30 Wall Street, 12th Floor
New York, New York 10005
Tel: (646) 216-2400
Fax: (646) 216-2373
xbailliard@ktpllp.com
jvansplinter@ktpllp.com
*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY FACTS ................................................................................................1

STATEMENT OF FACTS ............................................................................................2

LEGAL ARGUMENT ..................................................................................................8

I.     LEGAL STANDARD .......................................................................................8

II.    PLAINTIFF HAS SET FORTH A VALID TAKINGS CLAIM......................9

       A.    DEFENDANTS ACTIONS INTERFERED WITH PLAINTIFF'S
            COGNIZABLE PROPERTY INTERESTS .........................................9

       B.    DEFENDANTS' ACTIONS CONSTITUTED A TAKING OF PLAINTIFF'S
            PROPERTY INTERESTS. ................................................................10

              1.    PLAINTIFF'S REASONABLE, INVESTMENT-BACKED
                    EXPECTATIONS WERE SUBVERTED BY DEFENDANTS'
                    ACTIONS ...............................................................................12

              2.    THE ECONOMIC IMPACT OF THE REGULATION MILITATES
                    IN FAVOR OF THE FINDING OF A TAKING ......................................13

              3.    THE NATURE OF DEFENDANTS' ACTIONS MILITATES IN
                    FAVOR OF A TAKING...........................................................15

III.   PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS ARE VIABLE .................17

       A.    DEFENDANTS INTERFERED WITH PROTECTED PROPERTY
            AND LIBERTY INTERESTS ...............................................................17

       B.    DEFENDANTS' ACTIONS SHOCKS THE CONSCIENCE .............................17

IV.   PLAINTIFF'S PROCEDURAL DUE PROCESS CLAIM IS VIABLE .........................21

V.    PLAINTIFF'S CLAIMS ARE NOT FUTILE.................................................22

CONCLUSION...........................................................................................................23

## **TABLE OF AUTHORITIES**

**Cases**

**Page(s)**

*1700 Bergenline LLC,*
   HUD-L-001890-21 ........................................................................................................19

*Alston v. Parker,*
   363 F.3d 229 (3d Cir. 2004)..........................................................................................22

*Alvin v. Suzuki,*
   277 F.3d 107 (3d Cir. 2000).........................................................................................21

*Arkansas Game & Fish Com'n v. U.S.,*
   736 F.3d 1364 (Fed. Cir. 2013).....................................................................................16

*Armstrong v. U.S.,*
   364 U.S. 40 (1960)...............................................................................................11, 15

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)........................................................................................................8

*Bell Atlantic Corp. v, Twombly,*
   550 U.S. 555 (2007).......................................................................................................8

*Cebe Farms, Inc. v. U.S.,*
   116 Fed. Cl. 179 (Fed. Cl. 2014) ................................................................................10

*Chainey v. Street,*
   523 F.3d 200 (3d Cir. 2008).........................................................................................17

*Cherry Hill Towers, LLC v. Twp. of Cherry Hill,*
   407 F.Supp.2d 648 (D.N.J. 2006) ................................................................................17

*Ciampitti v. U.S.,*
   22 Cl. Ct. 310 (1991) ...................................................................................................13

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*
   526 U.S. 687 (1999)......................................................................................................16

*Clements v. Sanofi-Aentis, U.S., Inc.,*
   111 F.Supp.3d 586 (D.N.J. 2015) ................................................................................22

*Cnty. of Sacramento v. Lewis,*
   523 U.S. 833 (1998).....................................................................................................18

*Collier v. Town of Harvard*,
    1997 WL 33781338 (D. Mass. Mar. 28, 1997)......................................................................19

*Connolly v. Pension Benefit Guar. Corp.*,
    475 U.S. 211 (1986)......................................................................13

*Development Group, LLC v. Franklin Tp. Bd. of Supervisors*,
    2003 WL 22358440 (E.D. Pa. Sept. 24, 2003) ........................................................19

*East Cape May Assocs. v. Dep't of Envt'l Protection*,
    300 N.J. Super. 325 (1997) ......................................................................13

*Eichenlaub v. Twp. of Indiana*,
    385 F.3d 274 (3d Cir. 2004)......................................................................18

*Florida Rock Industries, Inc. v. U.S.*,
    45 Fed.Cl. 21 (1999) ......................................................................14

*Giuliani v. Springfield Township*,
    238 F.Supp.3d 670 (E.D. Pa. 2017) ......................................................................17

*Huntleigh USA Corp. v. U.S.*,
    525 F.3d 1370 (Fed. Cir. 2008), *aff'd* 75 Fed. Cl. 642 (2007), *cert. denied*, 555
    U.S. 1045 (2008)......................................................................10

*Hutton Park Gardens v. West Orange Town Council*,
    68 N.J. 543 (1975) ......................................................................15

*Kaiser Aetna v. U.S.*,
    444 U.S. 164 (1979)......................................................................11

*Karuk Tribe of Cal. v. Ammon*,
    209 F.3d 1366 (Fed.Cir.2000)......................................................................9

*Lingle v. Chevron U.S.A., Inc.*,
    544 U.S. 528 (2005)......................................................................11, 12, 14, 15

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003 (1992)......................................................................10, 12

*Lynch v. U.S.*,
    292 U.S. 571 (1934)......................................................................10

*Mansoldo v. State*,
    898 A.2d 1018 (N.J. 2006)......................................................................16

*MCQ's Enterprises, Inc. v. Phil. Parking Auth.*,
    2007 WL 127728 (E.D. Pa. Jan. 11, 2007) ......................................................................16

*Nicolette v. Caruso*,
   315 F. Supp. 2d 710 (W.D. Pa. 2003)..................................................................19

*OM 309-311, LLC, et al. v. City of Union City, et al.*,
   2022 WL 855769 (D.N.J. Mar. 23, 2022)..............................................10, 17, 19

*Palazzolo v. Rhode Island*,
   533 U.S. 606 (2001)..............................................................................11, 12

*Parrat v. Taylor*,
   451 U.S. 527 (1982)......................................................................................22

*Paul v. Jersey City Dept. of Housing*,
   2010 WL 1948361 (D.N.J. May 14, 2010).......................................................15

*Penn Central Transp. Co. v. New York City*,
   438 U.S. 104 (1978)............................................................................. *passim*

*Penn. Coal Co. v. Mahon*,
   260 U.S. 393 (1922)......................................................................................10

*Phillips v. County of Alleghaeny*,
   515 F.3d 224 (3d Cir. 2008)............................................................................8

*Phillips v. Washington Legal Foundation*,
   524 U.S. 156 (1998)......................................................................................10

*Prometheus Radio Project v. FCC*,
   373 F.3d 372 (3d Cir. 2004)............................................................................9

*Ruckelshaus v. Monsanto*,
   467 U.S. 986 (1984)......................................................................................12

*Singh v. Twp. of Weehawken*,
   2019 WL 13098594 (D.N.J. Aug. 21, 2019) .....................................................19

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
   535 U.S. 302 (2002)..................................................................11, 12, 15

*U.S. v. 68.94 Acres of Land*,
   918 F.2d 389 (3d Cir. 1990)..........................................................................14

*U.S. v. General Motors Corp.*,
   323 U.S. 373 (1945)........................................................................................9

*United Artists v. Township of Warrington, PA*,
   316 F.3d 392 (3rd Cir. 2003) .........................................................................18

*Vasquez v. Foxx*,
  895 F.3d 515 (7th Cir. 2018) ...................................................................................14

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980)..........................................................................................9, 12

*Zatuchni v. Richman*,
  2009 WL 1291480 (E.D. Pa. May 11, 2009) .........................................................21

**Statutes**

N.J.A.C. § 18.12-2.2(b)....................................................................................................2

**Other Authorities**

Rule 12(b)(6)...................................................................................................................22

U.S. Const. Amend. V .................................................................................................9, 10

U.S. Const. Amend. XIV ...........................................................................................9, 17

## PRELIMINARY STATEMENT

This is not a run-of-the-mill rent control case where a property owner is dissatisfied with the amount of rent available under a municipal rent control ordinance. Rather, this is a case about the abuse and violation by Defendants of their own rent control ordinances and its procedures for adjudicating disputes concerning the application of those ordinances. As alleged extensively in the Complaint ("Compl."), Plaintiff, the owner of a residential building in Weehawken, was subjected to a pattern of abuse and illegal behavior by Defendants. This included and culminated in the Defendants' willful disregard of the plain facts and its own ordinance to subject Plaintiff to farcical "proceedings" before the Township of Weehawken, to generate the pre-determined results of wildly improper and illegal controlled rent amounts *and* subjected Plaintiff to significant "lookback" liability *for the time it did not own the property*, a liability which runs with the land and finds no basis whatsoever in the rent control ordinance.

All of this was done to deprive Plaintiff of its right to legal rent and the legal benefit and enjoyment of its property, and was done specifically to benefit politically-favored individuals (tenants) at the expense of politically-disfavored ones (landlords). The actions by Defendants constitute a regulatory Taking in violation of the Fifth Amendment to the United States Constitution under the *Penn Central* standard articulated by the United States Supreme Court and a violation of Plaintiff's property and liberty interests in violation of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. Furthermore, any purported "remedies" available to Plaintiff to cure the premeditated, illegal conduct by Defendants are plainly and patently inadequate (indeed Defendants point to the farcical proceedings before the Rent Leveling Board as such a "remedy"), and accordingly Plaintiff's right to procedural due process was similarly violated.

1

Accordingly, the motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiff is currently the owner of a property located at 845 Boulevard East, Weehawken, New Jersey (the "Property"), which Defendants claim is subject to rent control.  Compl. ¶ 4.  New Jersey adopted rent control in or around 1973.  *See id.* ¶ 12.  In or around 1974, Weehawken passed its first rent control ordinance ("Ordinance").   Among other drastic measures, the Ordinance established as of 1974 a base rent for all rent-controlled units in Weehawken.  Any permissible increase in the base rent amount under the Ordinance was to be calculated from that original 1974 base rent. *See id.* ¶ 13.  Weehawken has since amended the Ordinance via numerous subsequent ordinances.  *See id.* ¶ 14.

As of 2002, the Ordinance, among other things, defined a Dwelling subject to rent controls as:

> ***Dwelling*** shall mean and include any building or structure or trailer or land used as a trailer park, occupied, rented or offered for rent or lease or available for rent to tenants. Exempt from this Chapter are motels, hotels and similar type buildings and buildings intended for transient use, floor space used strictly for commercial purposes in any type building, owner-occupied two and three family dwellings. A newly constructed dwelling rented for the first time is exempt to the extent that the initial rent may be determined by the landlord, and certified by the Board Secretary in a form approved by the Board, but all subsequent rents are subject to the rent limitations of this Chapter.

*See id.* ¶ 15.  As such, pursuant to the Ordinance, single family dwellings are not subject to rent control.  This includes condominium units, which are considered Class 2 Residential Property pursuant to N.J.A.C. § 18.12-2.2(b).  *See id.* ¶ 16.  More, as of 2002, pursuant to the Ordinance, any owner-occupied two and three family dwellings also were not subject to rent control.  *Id.* ¶ 17. However, the Ordinance did not define, let alone limit, the term "owner-occupied."  As such, owner-occupied could only be interpreted as any dwelling in lawful possession of the owner.  *Id.* ¶ 18.

In or around 2013, Weehawken realized that the undefined and unlimited term "owner-occupied" was very broad and decided to amend its Ordinance to significantly limit the scope of what constituted an "owner-occupied" dwelling. *Id.* ¶ 19. As such, in 2013, Weehawken passed Ordinance 12-2013 (the "2013 Ordinance"), by which it set forth a definition for "owner-occupied," which significantly limited the scope of what constituted an owner-occupied dwelling. *Id.* ¶ 20. Specifically, the Ordinance first explains that "the Township Council finds and determines that there is a need to amend and clarify certain provisions relating to the registration of rents under the Township Rent Leveling Ordinance." *Id.* The 2013 Ordinance then set forth a specific definition of "owner occupied"; specifically:

> *Owner Occupied* - shall mean a residential unit in which an owner, who is a natural person, resides as that owner's primary residence. The burden to prove the owner's occupied status of a unit shall be on the owner and shall be determined by the Board after submission of proofs satisfactory to the Board.

*Id.* ¶ 21. Of particular import, the 2013 Ordinance now requires that an owner occupy the dwelling as the "owner's primary residence", which limitation did not exist and was not required prior to the 2013 Ordinance. *Id.* ¶ 22. Finally, the 2013 Ordinance further provides that if/when a unit becomes no longer owner-occupied, the base rent for the unit may be established by written agreement between the owner and the new tenant. *Id.* ¶ 23. Specifically, it provides:

> Whenever an occupied rental unit in an owner occupied property that is exempt from the controls of this Chapter, becomes subject to the controls of this Chapter due to the cessation of an owner's occupancy, the base rent for that occupied unit may be established by written agreement between the tenant and landlord . . .

*Id.*

In or around 1993, LGE Realty (the "Prior Owner") purchased the Property, including Unit 3D. *Id.* ¶ 24. Until June 2010, Unit 3D was occupied by a tenant. *Id.* ¶ 25. At the time the tenant vacated the unit, the rent for Unit 3D was $740.41. *Id.* Around that time in 2010, the Prior Owner

thereafter began occupying Unit 3D the unit; thus Unit 3D became owner-occupied, pursuant to the applicable Ordinance. *Id.* ¶ 26.

From 2012 to 2013, the Prior Owner made significant renovations to Unit 3D, as a result of which a new base rent was set at $1,836.00. *Id.* ¶ 27. Since the unit was owner-occupied, the Prior Owner was not required to and thus did not seek to obtain a capital improvement increase (which it otherwise would have done had a tenant been occupying the unit). *Id.* ¶ 28. The Prior Owner lived, and continued to occupy, Unit 3D through September 2014. *Id.* ¶ 29. By September 2014, the base rent charged for Unit 3D totaled approximately $2,000.00 after permissible yearly rent increases. *Id.*

In or around September 2014, the Prior Owner member ceased to occupy Unit 3D. *Id.* ¶ 30. Thereafter, Hakan Ozcelik ("Ozcelik") moved into Unit 3D and entered into an agreement with the Prior Owner, whereby Ozcelik agreed to pay a monthly rent of approximately $2,000.00. *Id.* ¶ 31. All of these valid legal rent amounts were properly noted in each of the Rent Registration Statements filed by the Prior Owners, which statements were accepted, checked, and maintained in the City's files. *Id.* ¶ 32.

In or around December 2018, Plaintiff purchased several units in the Property, including Unit 3D. *Id.* ¶ 33. At the time, Plaintiff purchased the Property, Ozcelik still occupied Unit 3D, and the legal permissible rent was $2,306.04, after legally allowable rent increases, as shown on the Rent Registration Statements for the Property. *Id.* ¶ 34. However, Ozcelik paid only $2,044.00 due to having received a hardship concession from the Prior Owner. *Id.*

From September 2014 (when Ozcelik moved into Unit 3D) through June 2020, Ozcelik never complained about the legal rent charged for Unit 3D. *Id.* ¶ 35. More, the City, who was aware of (i) the owner-occupancy of Unit 3D from 2011 to late 2014, (ii) the new base rent for Unit 3D was set upon the owner-occupancy of Unit 3D, (iii) the rents charged to Ozcelik by the Prior Owner after the

new base rent was set, (iv), and the legal rental increases of the new base rent for Unit 3D through June 2020, never informed and/or challenged the new base rent or the legally permissible rental increases through June 2020. *Id.* ¶ 36.

Then, in or about July 2020, Ozcelik filed a complaint with the Rent Leveling Board regarding his rent. At the time, the rent for Unit 3D, with allowable increases, was $2,082.00. *Id.* ¶ 37. Ozcelik only complained about his rent in July 2020 at the suggestion of Weehawken officials. *Id.* ¶ 38. Despite receiving this complaint, Weehawken never informed Plaintiff of the filing of the complaint. *Id.* ¶ 39. And Weehawken never allowed Plaintiff to provide a response. *Id.*

Via a letter dated August 24, 2020, Plaintiff received notice from Weehawken that Ozcelik had made a complaint regarding the rent for Unit 3D and that an overcharge would be sought. *Id.* ¶ 40. The notice also informed Plaintiff that a special meeting of the Rent Leveling Board had been scheduled for September 2, 2020, only days later. *Id.* The meeting was then adjourned to April 13, 2021. *Id.* ¶ 41.

On or about April 13, 2021, the Rent Leveling Board conducted a meeting during which Ozcelik's complaint and rent for Unit 3D was discussed with Plaintiff. *Id.* ¶ 42. Plaintiff set forth the history of the Property and rental of Unit 3D. *Id.* ¶ 43. Via letter dated April 27, 2021 to the Rent Leveling Board, Plaintiff memorialized what was discussed at the April 13, 2021 hearing. *Id.* ¶ 44. Among other things, Plaintiff explained (i) that the Prior Owner had previously occupied Unit 3D, during which it had made renovations to the unit, (ii) at the time the Prior Owner occupied the unit, the applicable Ordinance provided that an owner-occupied dwelling was not subject to rent control, (iii) that the Prior Owner was not required to submit a capital improvement application to increase the rent for the unit after the renovations were complete because it was owner-occupied (and not occupied by a tenant, and thus not subject to the rent control Ordinance), (iv) as a result of the renovations and

owner-occupancy of the unit, a new base rent was set, and (v) the limitations on what constitutes an owner-occupied dwelling were not in place until 2013, when Ordinance 12-2013 was passed. *Id.* As such, the rents charged by the Prior Owner and Plaintiff for Unit 3D to Ozcelik after the unit was no longer owner-occupied were legally permissible. *Id.*

After the April 13, 2022 meeting and Plaintiff's submission of its letter dated April 27, 2021, the dispute as to the rent for Unit 3D was scheduled to be heard during Rent Leveling Board meetings on numerous occasions through 2022. *Id.* ¶ 45. Each time, Plaintiff received only little notice of the meetings. *Id.* Over the course of these meetings, Weehawken unilaterally calculated a new rent amount for Unit 3D, which resulted in a substantially lowered rent amount of $761.78 beginning in 2014 and a rent amount of $1,070.85 as of January 2023. *Id.* ¶ 46. As a result, Weehawken assessed Plaintiff with an overcharge to Ozcelik for the period beginning September 2014 (when Ozcelik moved into Unit 3D) through January 2023 in the amount of $94,752.75. *Id.*

In addition to the impropriety of Weehawken assessing any overcharge to Plaintiff (as set forth below), the overcharge amount included approximately $72,000.00 of rents that had been collected by the Prior Owner of the Property – prior to Plaintiff having purchased the Property in 2019. *Id.* ¶ 47. Weehawken's Ordinance does not contain any provision that allows for overcharges to be assessed to a current owner of a property for rents that were charged and collected by a prior owner. *Id.* ¶ 48. The Ordinance also does not contain any provision that an overcharge runs with a property. *Id.* Plaintiff had never received any complaint from Ozcelik, and had never been informed by Weehawken that Ozcelik had made any complaint regarding his rent prior to August 2020. *Id.* ¶ 49.

More, as set forth above, this new rental and overcharge calculation by Defendants was inaccurate as it failed to take into account the fact that (i) Unit 3D had been owner-occupied from

2010 to 2014, pursuant to the applicable Ordinance at the time, prior to Ozcelik moving into Unit 3D, (ii) during the time the unit was owner-occupied, the Prior Owner made significant renovations to the unit, (iii) because the unit was owner-occupied it was not subject to rent control, pursuant to the applicable Ordinance at the time, (iv) the Prior Owner did not need to submit a capital improvement application in order to set a new base rent, and (v) the new rent agreed to by Ozcelik when he moved into the unit in 2014 became the new base rent. *Id.* ¶ 50.   In making these new rent and overcharge calculations, the Board disregarded, arbitrarily and without any legal basis, all of Plaintiff's evidence regarding Unit 3D. *Id.* ¶ 51.  More, during the course of these meetings, Plaintiff repeatedly attempted to schedule a meeting with Weehawken Mayor Richard Turner to discuss the Rent Leveling Board's decision to unilaterally reduce the rent for Unit 3D and assess an overcharge.  *Id.* ¶ 52.  However, despite its best efforts, Plaintiff was unable to schedule a meeting.  *Id.* ¶ 53.

In one last attempt, via letter dated December 22, 2022 to Mayor Turner, after Plaintiff was aware that the Rent Leveling Board would enter a resolution regarding the new rent and overcharge calculations, without any legal basis, Plaintiff again asked to meet in order to discuss the Rent Leveling Board's decision. *Id.* ¶ 54.  Again, Plaintiff received no response from Mayor Turner.  *Id.* ¶ 55.  On April 19, 2023, the Rent Leveling Board scheduled the matter for the last time, during which it did not hear any argument from Plaintiff, but rather merely stated that it had finalized its rent and overcharge calculations and would enter a Resolution memorializing the same shortly.  *Id.* ¶ 56.

On April 27, 2023, Plaintiff was served with the Board's Resolution.  *Id.* ¶ 57.   In its Resolution, the Board memorialized that it rejected Plaintiff's arguments and submissions, reduced the base rent for Unit 3B and assessed Plaintiff an overcharge of $94,752.75.  *Id.* ¶ 58.  Among other things, in the Resolution, the Board ignored that (i) Unit 3D had been owner-occupied from 2010 to 2014, pursuant to the applicable Ordinance at the time, prior to Ozcelik moving into Unit 3D, (ii)

during the time the unit was owner-occupied, the Prior Owner made significant renovations to the unit, (iii) because the unit was owner-occupied it was not subject to rent control, pursuant to the applicable Ordinance at the time, (iv) the Prior Owner did not need to submit a capital improvement application in order to set a new base rent, and (v) the new rent agreed to by Ozcelik when he moved into the unit in 2014 became the new base rent. *Id.* The Board also improperly assessed Plaintiff overcharges totaling approximately $72,000.00 that had been collected by the Prior Owner, despite there being nothing in the Ordinance that allowed it to do so. *Id.* In so doing, the Board therefore arbitrary, capriciously and unreasonably ignored relevant information and its own Rent Leveling Ordinance in its Resolution. *Id.* ¶ 59.

In short, the Board and City blatantly violated Plaintiff's rights in order to improperly lower the rent for Unit 3D. *Id.* ¶ 60. As a result of Defendants' coordinated egregious abuse of power, under color of law, Plaintiff has suffered extensive monetary and other damages in the form of, among other things, lost rents and the diminution of the value of its property. *Id.* ¶ 61.

## LEGAL ARGUMENT

### I.   LEGAL STANDARD

A complaint sufficiently states a claim upon which relief may be granted when it alleges facts about the conduct of each defendant giving rise to liability. *Bell Atlantic Corp. v, Twombly*, 550 U.S. 555 (2007). The factual allegations must present a plausible basis for relief; that is, something more than the mere possibility of legal misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In assessing the complaint, the court must "accept all factual allegations as true and construct the complaint in the light most favorable to the plaintiff." *Phillips v. County of Alleghaeny*, 515 F.3d 224, 231 (3d Cir. 2008) (citations omitted). Here, Plaintiff certainly has

stated plausible bases for relief in each Count of the Complaint as to each Defendant and the motion should be denied.

## II.   **PLAINTIFF HAS SET FORTH A VALID TAKINGS CLAIM**

The "Takings Clause" of the Fifth Amendment prohibits the federal government from taking private property for public use without providing just compensation.  U.S. Const. Amend. V (". . . nor shall private property be taken for public use, without just compensation.")  The Takings Clause applies to state action through the Fourteenth Amendment.[1]  *See* U.S. Const. Amend. XIV; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980) (internal citations omitted).  As will be set forth below, Plaintiff certainly has sufficiently plead a takings claim here.

### A.   **Defendants' Actions Interfered with Plaintiff's Cognizable Property Interests.**

To succeed on a takings claim, "the plaintiff[s] must first show that a legally cognizable property interest is affected by the Government's act in question."  *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004); *see also Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed.Cir.2000) ("[A] court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'"); *see also U.S. v. General Motors Corp.*, 323 U.S. 373, 377-78 (1945) (property "denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.").

Of course, a fee simple interest in real estate is the type of property most commonly associated with takings claims.  However, it is long established that leasehold rights and other

---

[1] Similarly, the New Jersey Constitution provides "Private property shall not be taken for public use without just compensation."   *See* N.J. Const.1947, Art. 1, par. 20.

contracts constitute "property" for the purpose of a takings claim. *See Cebe Farms, Inc. v. U.S.*, 116 Fed. Cl. 179, 192 (Fed. Cl. 2014); *citing Lynch v. U.S.,* 292 U.S. 571, 579 (1934) (valid contracts are property within the meaning of the Takings Clause). Moreover, state law defines property interests for the takings analysis. *See Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998). Here, the property interests consist of: Plaintiff's (1) right to the use and enjoyment of the property it holds in fee simple interest; (2) right to the use and enjoyment of the leases which it entered into for the express purpose of its rental businesses; (3) rights to its investment backed expectations; and (4) right to not have its rents illegally lowered to absurd amounts so that Plaintiff could not make the required operating expenses to operate its business. These are cognizable, Constitutionally-protected property interests. *See OM 309-311, LLC, et al. v. City of Union City, et al.*, 2022 WL 855769, at *7 (D.N.J. Mar. 23, 2022) ("Generally, such "[l]ease rights are recognized property rights that are subject to the Takings Clause." . . . A wrongful reduction of the rent that the landlords can charge, in violation of the provisions of the rent control ordinance, could thus represent a deprivation of a recognized property interest. Similarly, the uncompensated taking of such a property interest could violate the Fifth Amendment.) (internal quotation and citation omitted).

### B.   Defendants' Actions Constituted a Taking of Plaintiff's Property Interests.

The Supreme Court has long recognized that takings are not limited to the "direct appropriation of property, or the functional equivalent of a practical ouster of the owner's possession." *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992). Rather, in *Penn. Coal Co. v. Mahon*, the Court noted that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking, thus initiating "regulatory takings" jurisprudence. 260 U.S. 393 at 415 (1922); *see also Huntleigh USA Corp. v. U.S.*, 525

F.3d 1370, 1378 (Fed. Cir. 2008) ("A compensable taking can occur not only through the government's physical invasion or appropriation of private property but also by government regulations that unduly burden private property interests[.]")   (citation omitted), *aff'd* 75 Fed. Cl. 642 (2007), *cert. denied*, 555 U.S. 1045 (2008).

Moreover, governmental regulation need not extract all of a property owner's value from the property for a taking to have occurred (i.e., a "partial taking").  In the over a century of case law developing and following *Mahon*, the Court has acknowledged that there is no bright-line test for precisely when regulation "goes too far," and rather courts must engage in "factual inquiries, designed to allow careful examination and weighing of the relevant circumstances." *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002).

In *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978), the Court articulated a set of factors to guide courts in determining whether a regulatory taking has occurred. Specifically, courts are to assess: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *See id*. at 124; *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001); *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005).  The inquiry is, by its very nature, an "ad hoc, factual" one (*see*, *e.g., Kaiser Aetna v. U.S.*, 444 U.S. 164, 175 (1979)) and made bearing in mind that "[t]he Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *See* Palazzolo, 533 U.S. at 681, *citing Armstrong v. U.S.*, 364 U.S. 40, 49 (1960).  Here, each of the *Penn Central* factors plainly weighs in favor of Plaintiff.

1.   **Plaintiff's Reasonable, Investment-Backed Expectations Were Subverted by Defendants' Actions.**

The first *Penn Central* factor that should properly be considered is the complete subversion of Plaintiff's reasonable, investment-backed expectations via Defendants' actions. This is because the Supreme Court has instructed that, of the three-part *Penn Central* test, the consideration of the property holder's investment-backed expectations takes precedence. *See Lingle*, 544 U.S. at 538-39 ("Primary among [the *Penn Central*] factors are the economic impact upon the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations."). Indeed, the Supreme Court has instructed that where – as here – the force of investment-backed expectations is "overwhelming," a taking can be found without the need to even consider the remaining factors. *See Ruckelshaus v. Monsanto*, 467 U.S. 986, 1005 (1984) ("the force of [the investment-backed expectations] factor is so overwhelming ... that it disposes of the taking question.").

Naturally, the government has the power to regulate, and a property owner's expectation "must be more than a unilateral expectation or abstract need." *See Ruckelshaus*, 467 U.S. at 1006, *quoting Webb's Fabulous Pharmacies, Inc.*, 449 U.S. at 161 ("[p]roperty interests . . . are not created by the Constitution. Rather, they are created and *their dimensions are defined by existing rules or understandings* that stem from an independent source such as state law . . . ) (emphasis added, internal citations omitted). Importantly, when considering the reasonability of a property holder's investment-backed expectations, "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of [his or her] expectations." *See Palazzolo*, 533 U.S. at 633 (O'Connor, concurring), *concurrence cited with approval in Tahoe-Sierra Preservation Counsel, Inc.*, 535 U.S. at 337 (2002); *see also Lucas*, 505 U.S. at n. 7 (Courts are to consider "how the owner's reasonable expectations have been shaped by the State's law of

property—i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value."); *East Cape May Assocs. v. Dep't of Envt'l Protection*, 300 N.J. Super. 325, 337 (1997) (investment-backed expectations "depend to a significant extent on whether [property owner] had notice in advance of [their] investment decision that the governmental regulations . . . had been or would be enacted."), *citing Ciampitti v. U.S.,* 22 Cl. Ct. 310, 320-21 (1991) (*citing Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227 (1986)).

This is anything but a run of the mill rent control case, where a plaintiff is dissatisfied with the amount of rent available under existing rent control regulation.   Rather, as set forth in detail above and in the Complaint, here the Defendants *violated* the rent control ordinance, willfully ignored and suppressed competent evidence of the actual, legal rents, and rendered the appeal before the Rent Leveling Board a farce all to obtained a preordained, illegal result, which interfered with Plaintiff's property rights in its property and with Plaintiff's existing – legal – leases with its tenant.   Obviously, this represents a wild interference with Plaintiff's reasonable, investment-backed expectations.   And again, when analyzing those expectations, it bears noting that, in penalizing Plaintiff with the completely inequitable "look-back" for rents *not even charged by Plaintiff nor when it owned the property*, the applicable ordinance does not permit this.   *See* Compl. ¶ 48.

### 2.   The Economic Impact of the Regulation Militates in Favor of the Finding of a Taking.

The *Penn Central* analysis "turns in a large part, albeit not exclusively, upon the magnitude of a regulations' economic impact and the degree to which it interferes with legitimate property

interests." *Lingle*, 544 U.S. at 540.[2]  Defendants' hand-waiving aside, it cannot be denied that Defendants' illegal actions resulted in a distinct diminution of the value of the property at issue (including, outrageously, illegal "lookback" rent liability which encumbers and runs with the land).

No court has ever ruled on the precise amount economic harm (or percent loss in investment) required to find a partial taking; that remains part of the "ad hoc," factual *Penn Central* analysis which of course must be viewed in the lens of the reasonable investment-backed expectations of the injured party.  *See, e.g., Lingle*, 544 U.S. at 538-39.  The Third Circuit has indicated that it is appropriate to view "the difference between the market value of the entire holding immediately before the taking and the remaining market value immediately thereafter of the portion of property rights not taken."  *U.S. v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990).  Courts, including the *Penn Central* Court itself, have also held indicated that should consider whether Plaintiffs, post-government action, are able to obtain a "reasonable return" on their investments.  *See Penn Central*, 438 U.S. at 136 (noting that the law at issue there – unlike here – "does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel. More importantly, on this record, we must regard the New York City law as permitting Penn Central not only to profit from the Terminal but also to obtain a "reasonable return" on its investment."); *Vasquez v. Foxx*, 895 F.3d 515, 525 (7th Cir. 2018) (In the *Penn Central* analysis, Courts are "instructed to look at [property owner's] "expectation concerning the use of the parcel" and whether they can obtain a "reasonable return" on their investment.") (internal citations omitted); *Florida Rock Industries, Inc. v. U.S.*, 45 Fed.Cl. 21, 39

---

[2]  Of course, government action or regulation may have the *incidental* effect of financially harming or even bankrupting a business without amounting to a taking – rather the harm must, as here, be the result of the targeted destruction of protected property rights.  *See Unity Real Estate Co.*, 178 F.3d 649, 677 (3d Cir. 1999).

(1999) ([T]he *Penn Central* Court emphasized the importance of obtaining a "reasonable return" on the property owner's investment in determining the presence of a taking . . . Although there is no right to recoup one's investment, the inability to do so weighs in plaintiff's favor.") (internal citations omitted); *see also Hutton Park Gardens v. West Orange Town Council*, 68 N.J. 543, 565–72, (1975) (rent control not unconstitutionally "confiscatory" so long as it permits a "just and reasonable return.").[3] Here, certainly at the pleading stage, Plaintiff has properly alleged that Defendants' wrongful interference has – in contravention of its reasonable, investment-backed expectations – has had a severe and economic impact due to the egregiously lowered rent for the unit at issue (from $2,044.00 to $1,070.85) and the unfounded imposition of the requirement that Plaintiff refund approximately $72,000 of purported rent overcharges that had been received by the prior owner of the property.

### 3. The Nature of Defendants' Actions Militates in Favor of a Taking.

The Supreme Court has instructed that final factor – the "character of the government action," "may be relevant in discerning whether a taking has occurred." *See Penn Central*, 544 U.S. at 538. This is because takings jurisprudence is grounded ultimately in "fairness and justice." *See Armstrong* 364, U.S. at 49; *see also Paul v. Jersey City Dept. of Housing*, 2010 WL 1948361 at *4 (D.N.J. May 14, 2010) ("Under certain circumstances, local land-use regulation, such as zoning, can constitute a taking by devaluing property, entitling the landowner to just compensation"). Where – as here – the government acted in bad faith, that of course weighs in favor of the finding of a taking. *See Tahoe-Sierra Pres. Council*, 535 U.S. at 333 (were it not for an express finding by the court below that the agency had acted in good faith, the Supreme Court

---

[3] Here, there is nothing "just" or "reasonable" about Defendants' actions or the economic impact it had on Plaintiff.

"might have concluded the agency was stalling" and found a taking); *citing City of Monterey v. Del Monte Dunes at Monterey, Ltd.* 526 U.S. 687, 698 (1999) (five-year bad faith delay by City constituted a regulatory taking).  Moreover, government action taken at the behest of or to benefit a group at the expense of a property owner may constitute a taking.  *See Arkansas Game & Fish Com'n v. U.S.*, 736 F.3d 1364, 1370 (Fed. Cir. 2013) (a temporary flooding by a government dam in response to requests from private agricultural interests could constitute a taking).

Here, the Complaint sets forth a coordinated scheme to, among other things, improperly (i) fail to notify Plaintiff that the tenant had filed a complaint regarding his rent in July 2020; (ii) ignore applicable ordinances that support Plaintiff's position that the unit was owner-occupied and thus not subject to rent control for a period of time; (iii) ignore direct evidence of the prior rents set forth in rent registration statements from 2011 to June 2020; (iv) ignore evidence that the prior owner had made renovations to the unit during the time the unit was not subject to rent control; (v) ignore that the prior owner was not required to submit a capital improvement application; (vii) ignore that a new base rent was set when the tenant at issue began occupying the unit; and (viii) assessing overcharges to Plaintiff for rents not charged and/or received by it (but rather by the prior owner).[4]  Accordingly, Plaintiff – certainly at the pleadings stage – has articulated claims for takings sufficient to sustain its Takings claim and (as set forth below) its substantive due process claim.

---

[4] More, Plaintiff here alleges that the Defendants did not even follow their own ordinances, let alone concepts of due process.  Plaintiff *relied* on Defendants to follow their own ordinances (not to mention the Constitution).  Moreover, of course, in all events even actions done for the public good can constitute takings.  *See, e.g., MCQ's Enterprises, Inc. v. Phil. Parking Auth.*, 2007 WL 127728 at *4 (E.D. Pa. Jan. 11, 2007) ("[C]olorable regulatory takings claim" exists notwithstanding fact that government action was "for the public good"); *Mansoldo v. State*, 898 A.2d 1018, 1024 (N.J. 2006) (Consideration of fact that state regulation "prevented a public danger" had "no bearing on whether the . . . regulation effected a taking.")

III.     **PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS ARE VIABLE.**

Courts apply a two-part test as to whether governmental action violates substantive due process: (i) whether the liberty or property interest at issue is worthy of due process protection; and (ii) whether the government's infringement of that protected interest "shocks the conscience." *See Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).  Here, Plaintiff has properly plead these elements.

A.     **Defendants Interfered with Protected Property and Liberty Interests.**

Defendants do not attempt to argue that the property interests at issue here (Plaintiff's right in its real property in the City and their fundamental right to be free from malicious government retaliation) are not protected by the 14th Amendment to the Constitution's guarantee of due process protections for "life, liberty, and property" – because it is indisputable that they are here.   *See*, *e.g.*, *Giuliani v. Springfield Township*, 238 F.Supp.3d 670, 696 (E.D. Pa. 2017) ("Here, plaintiffs own a piece of land that was affected by the Township's land use regulations, and therefore have established the presence of a property interest entitled to due process protection); *see also Cherry Hill Towers, LLC v. Twp. of Cherry Hill*, 407 F.Supp.2d 648, 654 (D.N.J. 2006); see also OM 309-311 6th St., LLC, 2022 WL 855769, at *7 (finding lease rights and the right to contract with tenants to charge the maximum legal rent, as determined by the rent control ordinance, to be a protected right).

B.     **Defendants' Actions Shocks the Conscience.**

Rather, the only question as to substantive due process here is whether – at the pleadings stage – Plaintiff has sufficiently alleged conduct which could be found to "shock the conscience". The answer to this question is yes.

The Supreme Court has instructed that there is no "measured stick" to determine whether governmental activity is conscience shocking; rather there is a spectrum, on one end, negligence is least likely to give rise to a claim, and "at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest[.]" *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).   In this regard, the determination of whether behavior is "conscience-shocking" requires an extremely fact-sensitive inquiry.  *See United Artists v. Township of Warrington, PA,,* 316 F.3d 392, 400 (3rd Cir. 2003) ("the meaning of this standard varies depending on the factual context.") Consistent with *Lewis*, Courts in this Circuit make clear that whether government activity interfering with a property right is conscience-shocking is whether the interference was corrupt, self-dealing, intentionally harmful, or constitutes a virtual taking.  *See Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004).  Under this rubric, Plaintiffs have – certainly at the pleading stage – plead conscience-shocking conduct.

More, Plaintiff has adequately pled that Defendants' actions were intentionally harmful. In fact, in cases far less egregious than the one presently before this Court, Courts do not hesitate to rule that corrupt, self-dealing or intentionally harmful action by government actors, even in the land use context, constitutes conscious shocking behavior.  For example, in *Frompovicz v. Twp. of South Manheim*, the plaintiff was found to have alleged conscience-shocking behavior where he alleged that the Township frustrated his ability to develop his property (specifically, to place a cell phone tower thereon) primarily so as to benefit a politically-favored individual who owned the only cell phone tower in the township.  *See* 2007 WL 2908292 at *2-5 (M.D.Pa. Oct. 4, 2007). The Court found that the plaintiff alleged he had "more than the kind of disagreement that is frequent in planning circles," and further noted that:

> [i]f plaintiff can prove, as he alleges, that defendants recklessly, intentionally, deliberately, maliciously, willfully and outrageously acted in an arbitrary and capricious manner for reasons unrelated to the merits of the proposed use of the property and the law . . . he will have demonstrated that public corruption prevented him from using his property as he intended.  This sort of official conduct, if proved, would constitute behavior that shocks the conscience.

*Id.* at * 13; *see also Development Group, LLC v. Franklin Tp. Bd. of Supervisors*, 2003 WL 22358440 at *6 (E.D. Pa. Sept. 24, 2003) (allegation that "defendants . . . attempted to persuade Plaintiffs to withdraw [plan] submissions through unlawful means . . . may indicate an arbitrary or irrational treatment of Plaintiffs' land use applications, and if Plaintiffs are able to prove Defendants' attempts to 'buy off' Plaintiffs and make an under-the-table deal the facts of the Complaint could be conscience-shocking to a jury"); *Nicolette v. Caruso*, 315 F. Supp. 2d 710, 723 (W.D. Pa. 2003) ("intent to harm"); *Collier v. Town of Harvard*, 1997 WL 33781338 at *4-6 (D. Mass. Mar. 28, 1997) (applying "shocks the conscience" standard and finding that "extortionate scheme" to extract easement from plaintiff for the benefit of planning board official, "touch on corruption in the process" and give rise to a claim for substantive due process violation); *Singh v. Twp. of Weehawken*, 2019 WL 13098594 at *1-2 (D.N.J. Aug. 21, 2019) (allegations that city officials engaged in an illegal scheme to force plaintiff to provide low-cost housing to an individual "could easily meet [the "shocks the conscious"] standard."); *see also 1700 Bergenline LLC*, HUD-L-001890-21 (denying motion to dismiss substantive due process claims that, among other things, Union City Rent Control Office's "improperly calculated the rent" which decision was improperly upheld by the Board.).

Here, Plaintiff has alleged a raft of factual allegations demonstrating not a "mistake" or an isolated arbitrary act or a single rogue officer but rather a concerted, premeditated, coordinated, and calculated effort to use improper and illegal means to deny Plaintiff of its constitutionally-protected rights.  To wit:

- Defendants deliberately failed to inform Plaintiff that its tenant had filed a complaint regarding his rent;

- Defendants deliberately failed to ignore evidence that the prior owner of the unit had occupied the unit from 2020 to September 2014;

- Defendants deliberately ignored the applicable ordinance at the time that, if correctly applied, made clear that the unit, once it became owner-occupied, was exempt from rent control;

- Defendants deliberately ignored that the prior owner had made capital improvements to the unit in 2012 and 2013;

- Defendants improperly subjected Plaintiff to the requirement to submit a capital improvement application, when the prior owner was not required to do so under the applicable ordinance;

- Defendants deliberately ignored that when the tenant moved into the unit (after the owner had ceased occupying it), the tenant agreed to pay s monthly rent of approximately $2,000;

- Defendants deliberately ignored evidence of this agreed upon rent (and subsequent legally permissible rents) as they were set forth in rent registrations statements submitted by the prior owner and Plaintiff and which were in the possession of Defendants;

- Defendants deliberately provided notice of a special hearing regarding the rent for the unit only days before the hearing was scheduled;

- Defendants deliberately ignored Plaintiff's April 27, 2021 letter which set forth in detail how and why its rent recalculation was improper;

- Defendants deliberately rescheduled and gave little notice of subsequent meetings regarding the rent at issue through 2022;

- Defendants unilaterally recalculated the rent at issue, lowering it by approximately $1,000.00, despite being in possession of the evidence submitted by Plaintiff showing that the calculation was improper;

- Defendants knowingly assessed excessive overcharge to Plaintiff for rents received by the prior owner (approximately $72,000), when they knew that the applicable ordinance did not permit them to do so; and

- Defendants ignored Plaintiff's repeated requests to meet with the Mayor to discuss the improper actions of Defendants.

*See* Compl., *see also,* Facts, *supra*.

This was all done to pervert the process established under law (including the rent control

ordinance itself) to render the Rent Levelling Board appeal process a farce so as to reach a

preordained result, corruptly harming Plaintiff and denying it its protected property rights for the benefit of an individual favored by government officials.  And it bears noting that this preordained result – which flies in the face of all competent evidence and equity – included the incredible and inequitable penalty of making Plaintiff liable for alleged (phantom) rent "overcharges" for years of rent *before* it owned the property at issue.  This is, simply put, a litany of conscience-shocking behavior.

## IV.     PLAINTIFF'S PROCEDURAL DUE PROCESS CLAIM IS VIABLE.

Defendants argue that Plaintiff's procedure due process claim should be denied because they were purportedly provided pre-deprivation remedies (in the form of the appeals before the rent levelling board) and post-deprivation remedies (in the form of filing a Prerogative Writ action) in connection with the deprivation they suffered in the form of the illegally-recalculated rent.  *See* Def. Br. at 12-13..  As set forth above, however, Defendants' bad acts were specifically calculated to render those very proceedings a farce.  Thus, this purported "remedy" was "patently inadequate" to stop Defendants' illegal campaign to deprive Plaintiff of legal rent.  *See Zatuchni v. Richman*, 2009 WL 1291480 (E.D. Pa. May 11, 2009) (denying motion to dismiss where defendant could not demonstrate that the appeals process could address Plaintiff's complaint, noting exhaustion of administrative remedies not required if "processes are unavailable or patently inadequate"), *citing Alvin v. Suzuki*, 277 F.3d 107, 116 (3d Cir. 2000).

Moreover, Defendants appear to characterize the rent levelling board appeal process as a "pre-deprivation" process.  *See* Def. Br. at 13.  This characterization is somewhat questionable, as much of the deprivation (for example the improper and illegal rent recalculation) occurred *sub rosa* without Plaintiff's notice or knowledge and certainly before the (sham) hearings.  More, as Defendants themselves acknowledge, post-deprivation processes are only potentially sufficient to

forestall a procedural due process claim where the "opportunity" to do so "at a meaningful time and in a meaningful manner", would be impractical.  *See id*. at 12, *quoting Parrat v. Taylor*, 451 U.S. 527, 540 (1982).  Here, it certainly was not impractical to provide a meaningful pre-deprivation process; Defendants merely chose not to and indeed compounded Plaintiff's harm by perverting that process through the acts alleged in detail in the Complaint.

Defendants also argue that Plaintiff failed to avail itself of the post-deprivation remedy of filing a Complaint in Lieu of Prerogative Writ in the Superior Court of New Jersey.  *See* Def. Br. at 13.  But Plaintiff did – it filed in this very case a Claim in Lieu of Prerogative Writ.  *See* Compl., Count Four.

Thus, Plaintiff's Procedural Due Process Claims should not be dismissed.

## V.   <u>PLAINTIFF'S CLAIMS ARE NOT FUTILE.</u>

Plainly, Plaintiff has suffered extreme injustice, harm, and a depravation of its Constitutional rights at the hands of Defendants.  The claims are not futile.  Should the Court for whatever reason determine that there is some deficiency in its pleading, the dismissal of any claim at this initial stage should be without prejudice and leave to re-plead.  *See Clements v. Sanofi-Aentis, U.S., Inc.,* 111 F.Supp.3d 586, 603 (D.N.J. 2015) ("where a complaint is dismissed on Rule 12(b)(6) grounds, 'a District Court must permit a curative amendment, unless an amendment would be inequitable or futile.'") *quoting Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).

## <u>CONCLUSION</u>

For all of these reasons, Plaintiff respectfully requests that this Court deny the Defendants' motions in their entirety.

Dated: November 27, 2023

**KRANJAC TRIPODI & PARTNERS LLP**

By: <u>s/ Xavier M. Bailliard</u>

Xavier M. Bailliard, Esq.
James Van Splinter, Esq.
30 Wall Street, 12th Floor
New York, New York 10005
Tel: (646) 216-2400
Fax: (646) 216-2373
jvansplinter@ktpllp.com
xbailliard@ktpllp.com
*Attorneys for Plaintiffs*